## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## (NORTHERN DIVISION)

| | |
|---|---|
| ROBERT D. THOMPSON, | |
| **Plaintiff,** | |
| **v.** | Civil Action No. 12-cv-02676-RDB |
| NAVAL ACADEMY ATHLETIC ASSOCIATION, | |
| **Defendant.** | |

## DEFENDANT NAVAL ACADEMY ATHLETIC ASSOCIATION'S
## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The Defendant, Naval Academy Athletic Association ("NAAA"), through its undersigned counsel, submits this Memorandum in Support of its Motion for Summary Judgment, and states as follows:

### INTRODUCTION

In the sole remaining claim in this case,[1] Plaintiff Robert D. Thompson ("Plaintiff") asserts a breach of contract claim against NAAA, alleging that NAAA breached a written Agreement for the provision of marketing services, by terminating the Agreement before the expiration of its three-year term. Because the written Agreement stated clearly and unambiguously that any party could terminate the Agreement at any time and for any reason on 180 days' written notice to the other, the maximum amount that could be owed under the

---

[1] The Complaint in this action named two additional defendants, Chester S. Gladchuk, Jr., President of NAAA, and Vice Admiral Michael H. Miller, who, until recently, served as Superintendent of the United States Naval Academy. The Complaint also asserted additional claims for (i) violation of the Maryland Wage Payment and Collection Act and (ii) breach of the duty of good faith and fair dealing. By Memorandum Opinion and Order dated August 1, 2013 (Document 29), the Court dismissed all claims against Gladchuk and VADM Miller, and it dismissed the above-listed claims against NAAA, on various grounds. Thus, the sole remaining claim in this case, which NAAA did not move to dismiss initially, is the breach of contract claim against NAAA.

Agreement is 180 days' compensation—*i.e.*, $105,000. Accordingly, in October 2013, NAAA

tendered that entire amount, plus interest, by paying that sum into the Court pursuant to FED. R.

CIV. P. 67. Based on NAAA's complete satisfaction of the breach of contract claim in that

manner, NAAA is entitled to summary judgment on that claim.[2]

## STATEMENT OF FACTS

### A.    *Background and the First Agreement.*

NAAA is a private, non-profit association that operates the intercollegiate athletic

programs of the United States Naval Academy (the "USNA"). (**Exhibit 13**, Affidavit of Barbara

Brozen, ¶ 1). NAAA is not a government entity. (**Exhibit 8**, Deposition of Chester Gladchuk

("Gladchuk Dep."), at 9-11).

In 2006, Plaintiff entered into a "Letter Agreement" to provide marketing services to

various offices associated with the USNA (the "First Agreement"). A copy of the First

Agreement is attached hereto as **Exhibit 1**. (**Exhibit 4**, Deposition of Plaintiff Robert Thompson

("Plaintiff Dep."), at 19:14-20:4). The First Agreement purported to be a three-party agreement

between Plaintiff, the USNA and NAAA. (Ex. 1, p.1). It was negotiated exclusively by and

between Plaintiff and Robert Parsons, who served as Deputy for Finance of the USNA. (Ex. 4,

Plaintiff Dep. at 29:16-30:20; **Exhibit 7**, Deposition of Barbara Brozen ("Brozen Dep."), at 9:5-

---

[2] This is the second time that NAAA has filed a Motion for Summary Judgment on this basis. NAAA initially filed a motion on October 11, 2013, before any discovery had taken place (Document 34). By Order dated June 4, 2014, the Court denied that motion without prejudice to re-filing. (Document 52). The Court ordered the parties to engage in limited discovery as to the facts and circumstances surrounding the termination of the Agreement, and it invited the parties to re-file summary judgment motions following that discovery. The parties engaged in the ordered discovery, and now, NAAA re-files this Motion for Summary Judgment with a more developed factual record.

While NAAA paid into the Court the moneys that would constitute the maximum amount owed under the Agreement's 180-day early termination provision, NAAA maintains that there is no valid contract at all, and thus, it owes *no* moneys under the Agreement, as NAAA has stated in correspondence to the Court. (Document 55). Accordingly, while NAAA does not dispute, solely for the purpose of this Motion, that Plaintiff is entitled to the 180 days' compensation, NAAA does not concede liability for that amount. In the event that this Motion is denied, NAAA preserves all of its defenses, including its defense that there is no valid contract.

7).  Plaintiff drafted the First Agreement in consultation with Parsons.  (Ex. 4, Plaintiff Dep. at 29:16-30:20).

The First Agreement described the services that Plaintiff was to provide, which included services to NAAA, the USNA's Office of Admissions, the USNA's Chapel, and the U.S. Naval Academy Foundation.  (Ex. 2, § IV).  As compensation for his services, the First Agreement stated that Plaintiff would receive a fixed monthly amount of $12,000, referred to as a "retainer." (Ex. 1, § V).  It further stated that at the end of each year, the Deputy for Finance (Parsons) shall review Plaintiff's work and its contribution to the USNA and "shall determine if a bonus above the retainer is appropriate." (*Id.*).  The First Agreement did not mandate the payment of a bonus and provided no criteria for the determination of any such bonus.  (*Id.*).  Plaintiff never received any bonus under the First Agreement or any of its successor Agreements.  (Ex. 4, Plaintiff Dep., at 57:13-15).

The stated term of the First Agreement was two (2) years, from May 1, 2006 to April 30, 2006.  (Ex. 1, § I).  However, the two-year term would automatically be extended by one additional year unless either party provided written notification to the other within the first year. (*Id.*, § VIII).

The First Agreement also stated that either party could terminate the First Agreement at any time during its term, for any reason, simply by giving 90 days written notice to the other party.  (*Id.*).  It stated: "The foregoing notwithstanding, it is agreed that either party shall have the right to terminate this Agreement for any reason upon ninety (90) days written notice to the other."  Parsons directed Plaintiff to include that early termination provision in the First Agreement when Plaintiff was drafting it (Ex. 4, Plaintiff Dep., at 103:18-104:10), and Plaintiff

understood that the USNA/NAAA had the right under the agreement to terminate it at any time on 90 days' notice. (*Id.* at 66:6-10, 102:14-19).

The First Agreement, like its successor Agreements, was funded entirely by the USNA; NAAA served as a conduit for payment of the invoices. (Ex. 8, Gladchuk Dep., at 25:10-15, 35:17-20). Each month, Plaintiff submitted invoices to Parsons; Parsons approved and forwarded the invoices to NAAA, and NAAA cut the checks to Plaintiff. (Ex. 4, Plaintiff Dep., at 75:6-76:2). The USNA subsequently reimbursed the USNA in full for the invoice amounts, which Plaintiff understood.[3] (Ex. 8, Gladchuk Dep., at 25:10-15, 35:17-20; Ex. 4, Plaintiff Dep., at 75:6-77:7).

**B.**     ***The Second Agreement.***

In 2008, before the expiration of the First Agreement's term, the parties extended the arrangement by entering into a second Letter Agreement (the "Second Agreement"). A copy of the Second Agreement is attached as **Exhibit 2**. (Ex. 4, Plaintiff Dep., at 19:14-20:4). Like the First Agreement, Plaintiff personally drafted the Second Agreement. (*Id.* at 98:17-21). The Second Agreement stated that it superseded and replaced the First Agreement. (Ex. 2, p.1 preamble).

The term of the Second Agreement was three years, from November 1, 2008 to October 31, 2011. (*Id.*, § I). The Second Agreement set Plaintiff's fixed monthly retainer at $15,000, which was an increase from $12,000 in the First Agreement. (*Id.*, § V). Plaintiff proposed that new retainer amount, and Parsons agreed. (Ex. 4, Plaintiff Dep., at 89:9-17). The bonus provision in the First Agreement was unchanged and again allowed Parsons to "determine if a bonus above the retainer is appropriate." (Ex. 2, § V). In addition to that discretionary

---

[3] In 2010, as a result of investigations into USNA financial practices, explained below, the USNA stopped reimbursing NAAA for Plaintiff's payments. However, NAAA continued to pay Plaintiff's invoices because it was told that reimbursements would follow. (Ex. 7, Brozen Dep., at 23:2-25:5, 57:16-19).

bonus, the compensation section stated that upon execution of the Second Agreement, "a separate supplemental payment may be made to [Plaintiff] in an amount to be determined by the Deputy for Finance." (*Id.*). Like the First Agreement, the Second Agreement did not mandate the payment of a bonus or the "supplemental payment" and stated no criteria for award of any such bonus/payment. (*Id.*). Again, Plaintiff received no bonus under the Second Agreement, and he received no supplemental payment upon the execution of the Second Agreement. (Ex. 4, Plaintiff Dep. at 92:6-18).

Like the First Agreement, the Second Agreement allowed any party to terminate the Agreement "for any reason" at any time during its term, but the Second Agreement extended the period of mandatory written notice from 90 days, which was in the First Agreement, to 120 days. (Ex. 2, § VIII). When he was drafting the Second Agreement, Plaintiff unilaterally changed the mandatory notice period from 90 days to 120 days; Parsons did not direct him to make that change. (Ex. 4, Plaintiff Dep. at 101:10-17). By extending the mandatory notice period from 90 to 120 days and by increasing the monthly retainer from $12,000 to $15,000, Plaintiff increased the amount of money that he would be guaranteed in the event of an early termination from $36,000 under the First Agreement ($12,000 × 3 months) to $60,000 under the Second Agreement ($15,000 × 4 months). (Ex. 4, Plaintiff Dep., at 106:15-107:7).

## C.    *The Third Agreement.*

In late 2010, with a year remaining on the Second Agreement's term, the parties again extended the arrangement by entering into a third Letter Agreement (the "Third Agreement"). A copy of the Third Agreement is attached hereto as **Exhibit 3**. (Ex. 4, Plaintiff Dep., at 19:14-20:4). Again, Plaintiff personally drafted the Third Agreement. (*Id.* at 123:7-11). The Third Agreement expressly stated that it superseded and replaced the Second Agreement. (Ex. 3, p.1

preamble).  Plaintiff understood that that provision meant that any and all obligations under the Second Agreement were extinguished and replaced by the Third Agreement.  (Ex. 4, Plaintiff Dep., at 124:6-13).

The Third Agreement set Plaintiff's fixed monthly retainer at $17,500, which was an increase from $15,000 in the Second Agreement.  (Ex. 3, § V).  Again, Plaintiff personally increased that retainer amount when he drafted the Second Agreement.  (Ex. 4, Plaintiff Dep., at 127:21-128:4).

The term of the Third Agreement was three years, from November 1, 2010 to October 31, 2013.  (Ex. 3, § I).  Like its predecessor Agreements, however, the Third Agreement allowed any party to terminate the Agreement at any time during its term, except that the Third Agreement extended the period of mandatory written notice from 120 days (in the Second Agreement) to 180 days.  (*Id.*, § VIII).  That early termination provision stated: "The foregoing notwithstanding, it is agreed that either party shall have the right to terminate this Agreement for any reason upon one hundred eighty (180) days written notice to the other."  (*Id.*).  Again, when he was drafting the Third Agreement, Plaintiff unilaterally changed the mandatory notice period from 120 days to 180 days; Parsons did not direct him to make that change, though Parsons did approve the change.  (Ex. 4, Plaintiff Dep. at 126:13-128:16).  By extending the mandatory notice period from 120 to 180 days and by increasing the monthly retainer from $15,000 to $17,500, Plaintiff increased the amount of money that he would be guaranteed in the event of an early termination from $60,000 under the Second Agreement ($15,000 × 4 months) to $105,000 under the Third Agreement ($17,500 × 6 months).

### D.   *Termination of the Third Agreement.*

In January 2011, Parsons resigned from the USNA and was temporarily replaced by Louis Giannotti, who became Acting Deputy for Finance.   (**Exhibit 5**, Deposition of Louis Giannotti ("Giannotti Dep."), at 13:12-14:4).   At that time, the USNA's spending and financial practices, including Parsons's practices, had been the subject of multiple government investigations and reports, one or more of which had resulted in discipline being imposed on Parsons.   (**Exhibit 6**, Deposition of Commander Justin Francis ("Francis Dep."), at 10:13-11:9, 131:13-136:5).   The USNA formed a "tiger team" called the Financial Management Assessment Group ("FMAG") to address the findings of those reports.   (*Id.* at 10:13-11:9).

One member of the FMAG was Commander Justin Francis.   (*Id.* at 10:13-21).   Because one such report addressed the lack of authority for payments from the USNA to NAAA, CDR Francis was tasked with drafting a "Performance Work Statement" to determine which tasks could be funded and reimbursed by the USNA to NAAA.   (*Id.* at 11:17-12:12).   In the course of that work, in late April or early May 2011, CDR Francis came across the Third Agreement and found it to be "very out of the ordinary" for several reasons, discussed below. (*Id.* at 12:13-16:9, 27:4-6).   Principally, the USNA was reimbursing NAAA with appropriated dollars (*id.* at 13:10-13), and Parsons, who signed the Third Agreement on behalf of the USNA and NAAA, was not a valid contracting officer and thus had no authority to enter into a contract on behalf of the Navy.   (*Id.* at 32:7-14).

CDR Francis set forth his conclusions and recommendations in a written memo to Captain Steven Vahsen, the USNA's Chief of Staff, a copy of which is attached hereto as **Exhibit 9**.   (Ex. 6, Francis Dep., at 10:2-8, 16:3-9).   In addition to the fact that Parsons lacked

contracting authority for appropriated funds, the memo details other issue that CDR Francis

found with the Third Agreement, as follows:

- The Third Agreement was in violation of governing Federal Acquisition Regulations (FAR 16.603 and DFARS 217.7404-1) governing "letter contracts." (Ex. 9 ¶ 2). A letter contract is a preliminary government contract entered into when time does not permit the parties to enter into a standard government contract, but which must be replaced by a formal standard contract. FAR 16.603 authorizes a letter contract only if the head of the contract activity determines that no other contract is suitable. Here, the head of contract activity was Naval Supply Systems Command, and that entity did not authorize a letter contract or any other form of contract. (Ex. 6, Francis Dep., at 137:15-138:18).

- The Third Agreement referred to paying for previous services. (Ex. 9 ¶ 2). In CDR Francis's experience, it is inappropriate for a federal contract to pay for previously rendered services. (Ex. 6, Francis Dep., at 59:14-60:6).

- The term of the Third Agreement was three years, and the appropriated funds used to reimburse presumably were from Operations & Maintenance, Navy ("OMN"). (Ex. 9 ¶ 2). Because OMN dollars are annually appropriated funds, fiscal rules apply. In CDR Francis's experience, it is inappropriate to have a period of performance in a contract funded with OMN dollars that exceeded 12 months. Contracts longer than that have option periods for each additional year beyond the first year. CDR Francis found the Third Agreement to be improper because it had a three-year term. (Ex. 6, Francis Dep., at 60:7-61:19).

- The scope of work included services for the Naval Academy Foundation. (Ex. 9 ¶ 2). The Foundation was a private entity that was not a party to the Agreement. (Ex. 6, Francis Dep., at 61:21-62:4).

- The compensation terms included a monthly retainer of $17,500 and the possibility of a bonus to be determined by the Deputy for Finance. (Ex. 9 ¶ 2). CDR Francis found it unusual that a government contract would provide a bonus without stating any criteria for awarding the bonus. (Ex. 6, Francis Dep., at 73:1-20).

In addition, CDR Francis found the timing of the Third Agreement to be suspect, in that Parsons

entered into the Third Agreement well after he was made aware, through the investigations, that

he had no authority to sign a contract for appropriated funds and very shortly before he resigned

from the USNA. (Ex. 6, Francis Dep., at 145:17-146:12).

Based on the foregoing, CDR Francis's memo recommended that the Third Agreement be terminated immediately and that the USNA command seek legal advice on any further investigative requirements. (Ex. 9 ¶ 3). On May 17, 2011, CDR Francis sent his memo to CAPT Vahsen. (Ex. 6, Francis Dep., at 50:10-51:3; **Exhibit 11**, Affidavit of Captain Steven Vahsen). The matter was brought to the attention of the USNA's Superintendent, Vice Admiral Michael H. Miller. (Ex. 11; **Exhibit 12**, Affidavit of Vice Admiral Michael H. Miller). Neither CAPT Vahsen nor VADM Miller was previously aware of the existence of the Third Agreement. (Exs. 11, 12). VADM Miller directed that the Third Agreement be terminated "because [his] legal advisors explained that neither its award nor its provisions comported with government contracting regulations." (Ex. 12).

Pursuant to VADM Miller's direction and the advice of the USNA's legal advisors, a USNA attorney prepared a letter for Giannotti's signature, which informed Plaintiff of the Third Agreement's termination. (Ex. 11). A copy of that letter, dated May 20, 2011, is attached hereto as **Exhibit 10**. It stated, in full:

Dear Mr. Thompson:

This letter is a follow-up to our conversation earlier this morning in which I informed you that the three-party Letter Agreement signed on October 29, 2010, between you and the Naval Academy Athletic Association/United States Naval Academy is terminated. As I mentioned, no further work should be performed under the terms outlined in the Agreement.

(Ex. 10).

On Friday, May 20, 2011, Giannotti called Plaintiff and told him of the decision to terminate the Third Agreement and that he would be receiving a letter confirming the termination. (Ex. 4, Plaintiff Dep. at 37:12-18). Plaintiff received the letter by mail the following Monday or Tuesday. (*Id.* at 132:11-17). That Monday, May 23, 2011, Plaintiff and Giannotti met in person, and Giannotti explained that the Third Agreement was terminated

9

because the attorneys concluded that it was not a valid contract, since Parsons did not have the authority to enter into a contract. (*Id.* at 132:3-10, 137:12-18).

## E.    Events Following Termination of Third Agreement.

Following the termination of the Third Agreement, Plaintiff was paid a pro-rated share of the fixed monthly retainer for the month of May, which covered the period of time from May 1 through May 20, 2011. (*Id.* at 152:6-20). Plaintiff subsequently requested payment of six months' compensation, $105,000, pursuant to the Third Agreement's 180-day early termination provision, and he submitted an invoice to Giannotti for that amount. (*Id.* at 160:14-162:12).

Following the termination, the matter of the Third Agreement was referred to Naval Criminal Investigative Services ("NCIS") for investigation. (*Id.* at 169:13-18). Giannotti told Plaintiff that no payment could be made because of the pending NCIS investigation. (*Id.*). Giannotti said that the investigation of the Third Agreement was part of the ongoing investigation of Parsons. (*Id.* at 170:1-9). Plaintiff did not subsequently receive payment of the 180 days' termination period pay. (*Id.* at 295:5-12).

Immediately following the termination of the Third Agreement, Plaintiff had numerous discussions and meetings with Giannotti about the possibility of reinstating the relationship. (*Id.* at 134:15-135:13; 137:9-11; Ex. 5, Giannotti Dep. at 137:1-21). Giannotti told Plaintiff that he would try to have the relationship reinstated. (Ex. 5, Giannotti Dep. at 152:7-12). Giannotti had no authority to enter into a contract on behalf of the USNA. (*Id.* at 145:1-146:8). Therefore, he spoke with several USNA officials and explored possible ways in which Plaintiff could be re-engaged at the USNA, but he was unsuccessful in obtaining authorization to re-engage Plaintiff. (*Id.* at 152:13-21).

**F.**       ***Tender of Termination Payment to Court.***

On October 11, 2013, NAAA tendered the payment of $120,085.48 into the Court, pursuant to Fed. R. Civ. P. 67.  That payment represents the $105,000 sum allegedly owed under the Third Agreement's 180-day early termination provision, plus accrued interest, as explained and calculated below.

**STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56, a party is entitled to summary judgment if "there is no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "If the non-moving party fails to make a showing 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' then the district court is *required* to grant summary judgment." *Pulley v. KPMG Consulting, Inc.,* 348 F. Supp.2d 388, 393 (D. Md. 2004) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)), *aff'd,* 183 Fed. Appx. 387 (4th Cir. 2006). The Court has "'an affirmative obligation ... to prevent 'factually unsupported claims and defenses from proceeding to trial.'"" *Id.* (quoting *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (internal citations omitted)).  Thus, to avoid summary judgment, the non-moving party must present more than a "scintilla of evidence" in support of his position; rather, he "must present evidence on which the jury could reasonably find in his favor." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)).

## ARGUMENT

**A.     NAAA IS ENTITLED TO SUMMARY JUDGMENT BECAUSE IT HAS TENDERED THE FULL AMOUNT ALLEGEDLY OWED UNDER THE THIRD AGREEMENT.**

> **1.     In Accordance With The Express Language Of The Third Agreement, The Most That Could Be Owed Under The Third Agreement Is 180 Days' Of Compensation Pursuant To The Early Termination Provision.**

The sole remaining claim in this case is a single breach of contract claim against NAAA. (Cp., Count 1).  While the Complaint does not clearly state precisely *how* NAAA allegedly breached the Third Agreement, the only *possible* breach that Plaintiff *could* assert is for failure to pay the 180 days' compensation allegedly owed under that Agreement's early termination provision.  That is because that provision in the Third Agreement made clear that any party could terminate the Agreement at any time by giving 180 days' notice to the other party.  It stated: "The foregoing notwithstanding, it is agreed that either party shall have the right to terminate this Agreement for any reason upon one hundred eighty (180) days written notice to the other." (Ex. 3, § VIII).  Because the USNA/NAAA had the unequivocal right to terminate the Third Agreement at any time and for any reason, Plaintiff cannot claim a right to compensation for the entire remaining balance of the Third Agreement and is limited to the compensation that allegedly is owed under the early termination provision.

It is well-settled that if a contract is terminable at any time upon notice to the other party, and it is terminated without providing such advance notice, the other party's damages are limited to those moneys that he would have received during the notice period.  In *Cottman v. State of Maryland, Department of Natural Resources*, 443 A.2d 638 (Md. App. 1982), the state of Maryland failed to give a tenant 30 days' notice of the termination of a lease, as mandated by the lease.  In holding that the tenant's recovery was limited to damages incurred during the 30-day

notice period, the Court adopted the reasoning of an out-of-state case, which stated: "The courts of other jurisdictions are virtually unanimous in holding that breach of a contract terminable at any time upon notice entitles the aggrieved party to recover only those net profits which he could have earned during the notice period; he may not recover profits for the entire term of the contract." *Id.* at 639-40 (quoting *Osborn v. Commanche Cattle Industries, Inc.*, 545 P.2d 827, 831 (Okl. App. 1975)). *See also, Storetrax.com, Inc. v. Gurland*, 895 A.2d 355, 368 (Md. App. 2006) (acknowledging that employer's termination of employment contract without required notice entitles employee only to his salary during the notice period (citing cases)), *aff'd*, 915 A.2d 991 (Md. 2007).

Indeed, this Court already has rejected Plaintiff's prior assertion that he is owed money through the entire term of the Agreement, and it has acknowledged that compensation for the 180-day notice period is the *maximum* amount that Plaintiff may recover.  In its August 1, 2013 Memorandum Opinion, in which it dismissed most of the claims in this case, the Court stated:

> [T]he terms of Plaintiff's contract preclude a claim for all anticipated income over the course of the three-year agreement, because the contract provided that "either party shall have the right to terminate this agreement for any reason upon one hundred eighty (180) days written notice to the other" *See* Contract ¶ VIII.  *The most that Plaintiff could demand under the terms of the contract is damages for the 180 days of notice that Defendants allegedly failed to give him* ....

Memorandum Opinion (Document 29), at p.13 (emphasis added) (ECF citations omitted).

Plaintiff's deposition testimony further makes clear that the failure to pay the 180 days' compensation under the early termination provision is the only way in which USNA/NAAA allegedly breached the Third Agreement.  When asked in deposition how NAAA committed a breach of contract, Plaintiff testified that the failure to pay 180 days' compensation was the only way in which it breached the Third Agreement.  (*Id.* at 205:11-206:1, 207:8-12).  Plaintiff made

a similar assertion in a prior brief filed with this Court.  In *Plaintiff's Memorandum of Law in Opposition to Motion for Partial Dismissal* (Document 20), Plaintiff stated: "Defendants breached the Contract when they did not give Plaintiff 'one hundred eighty (180) days written notice' of termination."  (*Id.*, p. 6).

Accordingly, based on the plain language of the Third Agreement and the undisputed facts, Plaintiff's potential recovery in this case is limited to the 180 days' of compensation under the Third Agreement's early termination provision.

### 2.   NAAA Has Paid Plaintiff The Full Amount Owed Under The Early Termination Provision By Tendering That Amount, Plus Interest, To The Court.

While Plaintiff was not provided advance notice of the Third Agreement's termination, NAAA has effectively tendered to Plaintiff all of the compensation that he is owed for that 180-day notice period, by paying that sum into the Court pursuant to FED. R. CIV. P. 67.  Specifically, on October 11, 2013, NAAA paid into the Court the sum of $120,085.48.  That sum represents the full amount of compensation that Plaintiff would have been paid during the 180-day notice period, plus accrued interest, as calculated below.

Of the $120,085.48 total sum paid into the Court under Rule 67, $105,000 represents six months of the fixed $17,500 monthly compensation provided in the Agreement, which Plaintiff would have received during the 180-day notice period ($17,500 × 6 months = $105,000).  (Ex. 3, §§ V, VIII).

The remaining portion of the Rule 67 payment, $15,085.48, consists of interest on the $105,000 principal balance, computed at a simple rate (*i.e.*, no compounding) of 6%.  Though the Third Agreement does not expressly require the payment of interest or state a governing rate of interest, NAAA included interest at that rate, which is the legal rate of interest in Maryland.

MD. CONST. Art. III, § 57; MD. CODE ANN., COMM. LAW § 12-102.  That also is the rate that this Court has stated should be charged for pre-judgment interest.  *Industrial Enterprises, Inc. v. Penn America Ins. Co.*, 2009 U.S. Dist. LEXIS 132648, *40-41 (D. Md. 2009) (Bennett, J.); *Sherwood Brands, Inc. v. Levie*, 2006 U.S. Dist. LEXIS 13099, *54 n.16 (D. Md. 2006).  In this case, interest was calculated to run from May 20, 2011, the date on which the Agreement was terminated, until October 11, 2013, the date on which payment was tendered to the Court, which was two years and 144 days.  Thus, the interest calculation is as follows:

| | | |
|---|---|---|
| 2 years of interest:  2 years × 6% × $105,000 = | $ 12,600.00 |
| 144 days of interest:  144/365 × 6% × $105,000 = | $  2,485.48 |
| Total interest: | $ 15,085.48 |

Accordingly, since NAAA has now fully satisfied its claimed obligation under the Third Agreement by paying the full amount allegedly owed under that Agreement's 180-day early termination provision, there is no further controversy and nothing further to litigate in this case. NAAA's full satisfaction of the breach of contract claim entitles it to summary judgment on that claim.

**3.    Paying The Full Amount Allegedly Owed Under The Early Termination Provision Into The Court Under Federal Rule 67 Is Appropriate Under The Circumstances Of This Case Because Plaintiff Disputes The Validity Of The Early Termination Provision.**

Although NAAA, solely for the purpose of this Motion, does not dispute Plaintiff's entitlement to compensation for the 180-day early termination period, NAAA did not make an unconditional payment of that sum directly to Plaintiff but rather tendered payment of that sum into the Court pursuant to FED. R. CIV. P. 67.  As explained below and in NAAA's previously-filed *Motion for Leave To Pay Funds Into Court* (Document 35), the unique circumstances of

this case dictate that using Federal Rule 67 is an appropriate vehicle for paying the contract sum in this case.

Federal Rule 67, entitled "Depositing Property," states, in pertinent part:

> If any part of the relief sought is a money judgment or the disposition of a sum of money or some other deliverable thing, a party—on notice to every other party and by leave of court—may deposit with the court all or part of the money or thing, whether or not that party claims any of it.

FED. R. CIV. P. 67(a).  Money paid into the Court under Rule 67 must be deposited in an interest-bearing account or invested in a court-approved, interest-bearing instrument, and it must be deposited and withdrawn in accordance with 28 U.S.C. §§ 2041 and 2042.  FED. R. CIV. P. 67(b). Among other requirements of those statutes, which are procedural in nature, 28 U.S.C. § 2042 states that money deposited under § 2041 may only be withdrawn by order of court.

As discussed below, Plaintiff's counsel has asserted, in prior briefing filed with this Court, that Plaintiff is seeking compensation not for the 180-day early termination period but rather for the full remaining balance of the Third Agreement's three-year term (the remaining portion of the term is nearly two-and-a-half years), under the theory that Plaintiff gave up his right to past bonuses allegedly earned under the predecessor Agreements, in exchange for entering into the Third Agreement and agreeing to its three-year term.  The fallacies in that argument are set forth below.  In making that assertion, Plaintiff effectively argues that the Third Agreement's early termination provision is ineffective and should be disregarded by the Court.

While that assertion is wrong for the reasons discussed below, in the unlikely event that Plaintiff were to prevail on that argument and convince the Court that the Third Agreement, including its 180-day early termination provision, is not binding on the parties in accordance with its express terms, thus resulting in a denial of this Motion, such a ruling would mean that NAAA does *not* owe Plaintiff compensation for the 180-day early termination period.

Accordingly, if NAAA were to have paid that sum directly to Plaintiff, it would have done so in error and Plaintiff would have been unjustly enriched, since the payment by NAAA is expressly premised on and is made pursuant to the 180-day early termination provision.   Moreover, as stated *supra* in footnote 2, if this Motion is denied, NAAA preserves all of its defenses, including its defense that the Third Agreement is invalid, and thus, it owes *no* moneys under that Agreement.  Again, therefore, Plaintiff would have been unjustly enriched by a direct payment to him.  NAAA's payment of funds into the Court under Rule 67 will prevent any such unjust enrichment, since Plaintiff will receive the funds only if the Court grants this Motion.

For the foregoing reasons, the unique circumstances of this case make Rule 67 an appropriate vehicle for payment.  After this Motion for Summary Judgment is granted, and after Plaintiff's time for filing an appeal of that ruling has expired or Plaintiff has exhausted all such appeals, Plaintiff may file a motion for withdrawal of those funds, and this Court may enter an order pursuant to Rule 67 and 28 U.S.C. § 2042 that all such funds should be withdrawn and paid to Plaintiff.

## B.      PLAINTIFF'S ARGUMENTS THAT HE IS OWED THE FULL REMAINING BALANCE OF THE THIRD AGREEMENT HAVE NO MERIT.

In his prior briefing filed with the Court, Plaintiff argued that he is owed compensation for the entire three-year term of the Third Agreement and is not limited to the 180 days' notice period under the early termination provision.  Plaintiff has advanced two separate arguments in support of that position.  First, he asserts that he waived bonuses accrued under the First and Second Agreements in exchange for the Third Agreement's three-year term, which precludes the USNA/NAAA from exercising the early termination provision.  (Document 38).   Second, he asserts that following the termination, Giannotti assured him that his Agreement would be reinstated.  (Document 48).  As explained below, neither argument has a shred of merit.

17

1.     **Plaintiff's Argument that the USNA/NAAA Could Not Exercise the Early Termination Provision Because He Waived Bonuses Accrued Under the Predecessor Agreements Lacks Merit.**

As stated in prior briefing, Plaintiff's principal argument is that when he entered into the Third Agreement, he bargained for a full three-year term by giving up his right to bonuses accrued under two predecessor Agreements, and thus, the USNA/NAAA was precluded from exercising the early termination provision. That argument is fatally flawed.

First, because the early termination provision is clear and unambiguous that either party could terminate on 180 days' notice, Plaintiff may not present—and the Court may not consider—extrinsic evidence of a contrary intent. Second, even if the Court did consider such evidence, it does not create a dispute of material fact that the recovery is limited to the 180 days' notice period.

  a.  *Because the Third Agreement is Clear and Unambiguous that either Party Could Terminate It on 180 Days' Notice, any Extrinsic Evidence of a Contrary Intent is Inadmissible and May Not Support an Opposition to a Summary Judgment Motion.*

Plaintiff's argument that the Third Agreement's early termination provision was of no force and effect because Plaintiff bargained for a full three year term is contrary to the clear and unambiguous language of that Agreement, which made clear that any party could terminate it at any time on 180 days' notice. In prior briefing, Plaintiff supported that argument with his own affidavit regarding his intent in entering into the Third Agreement (Document 38-1) as well as a preliminary recital at the beginning of the Third Agreement, which stated that the Third Agreement "takes special note of [Plaintiff's] initiative and willingness, as the Academy has faced a challenging economic environment, to waive significant bonuses that otherwise accrued during the terms of the two (2) prior Agreements." (Ex. 3 p.1). Because the Third Agreement is clear and unambiguous that any party could terminate the Agreement at any time on 180 days'

notice, Plaintiff is precluded from offering any extrinsic evidence of a contrary intent, as such evidence is barred by the parol evidence rule.

Under the objective theory of contract interpretation, which is adhered to in Maryland, if the language of a contract is unambiguous, the Court must give effect to its plain meaning, regardless of the parties' intentions at the time the contract was formed.[4] *Geoghegan v. Grant*, 2011 U.S. Dist. LEXIS 15783, *16 (D. Md. 2011); *Ocean Petroleum Co., Inc. v. Yanek*, 5 A.3d 684, 690 (Md. 2010) ("unless a contract's language is ambiguous, we give effect to that language as written without concern for the subjective intent of the parties at the time of formation"); *Cochran v. Norkunas*, 919 A.2d 700, 710 (Md. 2007) ("If the language of a contract is unambiguous, we give effect to its plain meaning and do not contemplate what the parties may have subjectively intended by certain terms at the time of formation."). In determining whether an ambiguity exists, the Court must restrict its inquiry to the "four corners" of the contract and ascribe to the contract language its "customary, ordinary, and accepted meaning." *Ocean Petroleum*, 5 A.3d at 690 (citations omitted). Thus, where contract language is unambiguous, the Court may not look beyond the plain meaning of that language, and "parol evidence is not admissible to show the intention of the parties or to vary, alter, or contradict the terms of that contract." *Ubom v. Suntrust Bank*, 17 A.3d 168, 173 (Md. App. 2011). Only where the contract language is ambiguous may the Court look to extrinsic evidence of the parties' intent. *Id.*; *Geoghegan*, 2011 U.S. Dist. LEXIS 15783, *16-17.

Here, the Third Agreement is clear and unambiguous that it could be terminated by either party on 180 days' written notice to the other party. The early termination provision plainly stated: "The foregoing notwithstanding, it is agreed that either party shall have the right to

---

[4] The interpretation of a written contract, including a determination of whether a contract is ambiguous, is a question of law for the Court. *Cook v. Nationwide Ins. Co.*, 2013 U.S. Dist. LEXIS 143237, *37 (D. Md. 2013); *Ocean Petroleum*, 5 A.3d at 690.

terminate this Agreement for any reason upon one hundred eighty (180) days written notice to the other." (Ex. 3, § VIII). That language could not be clearer and gave any party the right to terminate early for any reason on 180 days' notice; it is not subject to more than one interpretation. Thus, the Court cannot consider any extrinsic evidence, including Plaintiff's testimony about the parties' intent, to contradict that clear and unambiguous language.

Nor does the above-quoted recital at the beginning of the Third Agreement about the waiver of bonuses create an internal ambiguity in that Agreement. That language fails to create an ambiguity because, *inter alia*, it is simply a recital in the Agreement's preliminary section and does not impose contractual obligations or otherwise define the operative terms of the Agreement. *See J.E. Dunn Constr. Co. v. S.R.P. Dev. Ltd. Partnership*, 2012 U.S. Dist. LEXIS, *10 (D. Md. 2012) ("Under Maryland contract law, courts look to the body of an agreement, not the introduction alone, to determine the meaning of a contract."); *Pulaski v. Riland*, 86 A.2d 907, 910 (Md. 1952) (rejecting argument that recital governed contractual rights, since court "must look to the operative part of the agreement to find out what the parties actually did"); *Wilson v. Towers*, 55 F.2d 199, 200 (4th Cir. 1932) (if recitals and operative part of contract are inconsistent with each other, operative part controls).

Moreover, the early termination provision precludes any contrary interpretation of the recitals because it states: "*The foregoing notwithstanding*, it is agreed that either party shall have the right to terminate this Agreement for any reason upon one hundred eighty (180) days written notice to the other." (Ex. 3, § VIII (emphasis added)). Beginning the early termination provision with "[t]he foregoing notwithstanding" means that it overrides and takes precedence over any contrary "foregoing" language. *See McGraw v. Loyola Ford, Inc.*, 723 A.2d 502, 517-18 (Md. App. 1999) (statute subsection (f)'s use of phrase "notwithstanding subsection (a)" means that

"subsection (f) takes precedence over subsection (a)," since plain meaning of "notwithstanding" is "without prevention or obstruction from or by; in spite of" (quoting Webster's Third New International Dictionary 1545 (2nd ed. 1976))), *cert. denied*, 727 A.2d 382 (Md. 2001); *Ridge Sheet Metal Co., Inc. v. Morrell*, 517 A.2d 1133, 1137 (Md. App. 1986) (same). Since the early termination provision is the last provision in the Agreement, it overrides any contrary language in the Third Agreement, including the recital relied on by Plaintiff.

Indeed, courts addressing similar early termination provisions in written contracts have found them to be clear and unambiguous, and have rejected arguments that the contracts were rendered ambiguous because of other contract language and refused to allow extrinsic evidence that the parties intended another meaning. In *Faltings v. IBM Corp.*, 1988 U.S. App. LEXIS 19562 (4th Cir. 1988), IBM terminated a dealer contract pursuant to a provision that stated: "Notwithstanding any other provision of this Agreement, it may be terminated, with or without cause, upon three months' written notice by IBM." *Id.* at *12. The dealer sued IBM for breach of contract based on the termination, arguing that the contract was ambiguous because another clause in the contract allowed IBM to terminate on two months' notice only after giving the dealer an opportunity to "cure" its deficiencies, and that the two termination provisions could be read together to impose the opportunity to cure requirement on the three-month termination provision as well. *Id.* at *11-12. The Fourth Circuit rejected the dealer's argument and held that the three-month termination without cause provision stood alone and "unambiguously conferred an unrestricted right to terminate upon three months' notice." *Id.* at *12.

Likewise, in *Cromeens v. AB Volvo*, 349 F.3d 376 (7th Cir. 2003), Volvo terminated several dealer agreements entered into between the dealers and Volvo's predecessor, Samsung, pursuant to a provision that allowed either party to terminate the agreement without cause on 60

days' written notice to the other.  The dealers sued Volvo for, *inter alia*, breach of contract, arguing that Samsung verbally assured them that it would terminate a dealer agreement under that provision only if a dealer was performing inadequately, which was not the case here.  *Id.* at 392-93.  The court found the agreements to be clear and unambiguous on the issue of termination without cause, stating that provision "must mean what it says or the provision is rendered superfluous."  *Id.* at 394.  Thus, it rejected the dealers' proffer of extrinsic evidence of Samsung's verbal statements, since doing so would "rewrite the contracts."  *Id.* at 394-95.

As in the foregoing cases, the Third Agreement in this case is clear and unambiguous that the USNA/NAAA could terminate it at any time and for any reason on 180 days' notice.  Any attempt by Plaintiff to avoid that contract term through the use of extrinsic evidence is unavailing, and any extrinsic evidence offered by Plaintiff of a contrary intent would constitute inadmissible parol evidence.  Because Plaintiff can only oppose a summary judgment motion with material that is admissible in evidence, FED. R. CIV. P. 56(c), any testimony of Plaintiff that would contradict the early termination provision cannot be considered in response to this Motion, and NAAA is entitled to summary judgment.

> ### b.  *Plaintiff's Testimony Regarding the Waiver of Prior Bonuses is Not Supported by the Facts and Does Not Create A Dispute of Material Fact That Plaintiff's Recovery is Limited to the Early Termination Provision in any Event.*

Even in the absence of the parol evidence rule, Plaintiff's testimony regarding the alleged waiver of bonuses is not supported by the facts and does not create a dispute of material fact that Plaintiff's potential recovery under the Third Agreement is limited to the 180-day early termination period.

First, the undisputed facts show that Plaintiff did *not* waive any bonuses under the First and Second Agreements, since those Agreements did not guarantee Plaintiff a bonus, and

Plaintiff was not awarded a bonus.  Rather, both Agreements stated that the grant of a bonus was purely discretionary—lying in Parsons's sole discretion.  (Exs. 1 and 2, § V; Ex. 4, Plaintiff Dep. at 108 (acknowledging that bonuses were discretionary).  At no time did Parsons ever exercise that discretion and award a bonus to Plaintiff.  (*Id.*).  Moreover, Parsons never communicated to Plaintiff that he was being awarded a bonus in any particular amount, and Plaintiff and Parsons never discussed particular numbers—or even a range of numbers—regarding any prospective bonus award.  (*Id.* at 211:9-212:5).  To the contrary, Plaintiff acknowledges that at the time that he entered into the Third Agreement, any award of a bonus was unlikely because Parsons was "under considerable pressure" from the investigations of his financial activities.  (*Id.* at 211:9-212:5).  In other words, this is not a case where Plaintiff gave up a bonus that was guaranteed to him or was awarded to him.  By stating that he waived bonuses, Plaintiff only "waived" something that he never had in the first place and was not going to receive.

Even if the waiver of bonus was supported by the facts, that would not relieve the USNA/NAAA of its contractual right under the Third Agreement to terminate the Agreement early pursuant to the early termination provision.  Regardless of the circumstances surrounding the Third Agreement, the parties entered into that Agreement according to its express terms, and one such express term was the early termination provision.

That is especially true in this case, since careful consideration was given to the early termination provision in each Agreement, as Plaintiff personally and conscientiously amended that provision each time the Agreement was re-written in order to extend its period of mandatory notice.  As stated above, when the First Agreement was written, Parsons insisted that it include an early termination clause.  (Ex. 4, Plaintiff Dep. at 103:18-104:10).  When Plaintiff personally drafted the Second and Third Agreements, he unilaterally (*i.e.*, not at Parsons's direction)

extended the notice period each time—when he drafted the Second Agreement, he extended it from 90 to 120 days, and when he drafted the Third Agreement, he extended it from 120 to 180 days. (*Id.* at 101:14-17, 127:21-128:16). Because he also unilaterally increased the fixed monthly retainer with each new Agreement—from $12,000 to $15,000 to $17,500—the total guaranteed compensation payable to Plaintiff upon the exercise of the early termination provision increased dramatically with each new Agreement, from $36,000 (First Agreement) to $60,000 (Second Agreement) to $105,000 (Third Agreement). (Exs. 1-3). Those amendments, which Plaintiff incorporated at his own behest, provided increasing and considerable security to Plaintiff, in that they ensured that he would receive a substantial amount of guaranteed money in the event that the USNA/NAAA chose to exercise the early termination provision and terminate the Third Agreement before the expiration of its term. Indeed, it is pursuant to those revisions that NAAA has tendered the sum of $105,000 plus interest to Plaintiff.

Plaintiff's attempt to simply ignore the early termination provision or attempt to write it out of the Third Agreement cannot stand, especially when he affirmatively and conscientiously amended that provision for his own benefit each time the Agreement was re-written, to provide greater security for himself. Indeed, such an attempt by Plaintiff runs afoul of the rule of construction that "effect must be given to each clause" in a contract, and courts should avoid "an interpretation which casts out or disregards a meaningful part of the language of the writing ...." *Cochran*, 919 A.2d at 710 (quoting *Sagner v. Glenangus Farms*, 198 A.2d 277, 283 (Md. 1964)). Having made a conscious decision to include and extend the early termination provision in the Third Agreement, which he drafted, Plaintiff cannot now try to avoid its application.

2. **Plaintiff's Allegation That Giannotti Assured Him That The Agreement Would Be Reinstated Is Irrelevant and Did Not Impose a Binding Obligation to Reinstate or Continue that Agreement.**

In his prior briefing, Plaintiff alleged that when Giannotti informed him that the Third Agreement was terminated and in subsequent conversations, Giannotti assured him that the Agreement would be reinstated or replaced.  That argument has no merit because even if those gratuitous statements were made, they did not negate the termination of the Third Agreement and did not create a binding obligation on behalf of the USNA or NAAA to reinstate the Agreement or otherwise continue the relationship in any way.

To be clear, Giannotti did not *assure* Plaintiff that his Agreement would be reinstated or replaced; he told Plaintiff only that he would *try* to find a way for Plaintiff to maintain a relationship with the USNA. (Ex. 5, Giannotti Dep. at 152:7-21).  Giannotti spoke with several officials at the USNA and made efforts to have Plaintiff reemployed somehow, but he was unsuccessful in his attempts. (*Id.* at 152:7-21).  Regardless of exactly what Giannotti told Plaintiff, however, it is undisputed that the Third Agreement was terminated on May 20, 2014, as made clear by Giannotti's letter of that date.  Any discussed reinstatement of Plaintiff would have entailed a new contract or new relationship with Plaintiff.  Giannotti testified in deposition that he made clear to Plaintiff that Plaintiff's Third Agreement was being terminated and that his subsequent discussions with Plaintiff entailed the possibility of a "[n]ewly dated agreement. Start the relationship over again." (*Id.* at 137:9-21).

Once the Third Agreement was terminated, the USNA and NAAA were under no obligation to Plaintiff to enter into a new agreement or other arrangement with him.  While Giannotti tried to help Plaintiff by finding a way for him to become reinstated, any statements made by Giannotti to that effect and any efforts undertaken by him were gratuitous.  They

certainly did not revoke the termination or otherwise bind the USNA or NAAA to the three-year term of the Third Agreement, which was terminated.  Nothing that Giannotti might have said negated the fact that the Third Agreement was terminated, and thus, the only possible obligation under that Agreement was payment under the early termination provision, as discussed above.

## CONCLUSION

For the foregoing reasons, NAAA is entitled to summary judgment on the sole remaining breach of contract claim against NAAA.

Respectfully submitted,

/s/

Charles Kresslein (Fed. Bar No. 22967)

JACKSON LEWIS P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209
Phone: (410) 415-2000
Fax: (410) 415-2001
charles.kresslein@jacksonlewis.com

Counsel for Defendant,
*Naval Academy Athletic Association*